No. 23-10992

# In the United States Court of Appeals for the Eleventh Circuit

FAMILY HEALTH CENTERS OF SOUTHWEST FLORIDA, INC.,

*Plaintiff/Appellee*,

v.

WEIDA, JASON, IN HIS OFFICIAL CAPACITY AS SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,

*Defendant/Appellant*.

## APPELLANT'S CORRECTED BRIEF

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA
No. 2:21-CV-278

ASHLEY MOODY
ATTORNEY GENERAL

ANDREW T. SHEERAN
*General Counsel*
Agency for Health
Care Administration
2727 Mahan Drive, Building 3
Tallahassee, FL 32308

HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
CHRISTOPHER J. BAUM, B.C.S.
*Senior Deputy Solicitor General*
Office of the Attorney General
1 SE 3rd Avenue
Miami, FL 33131
(978) 460-1314; (850) 410-2672 (fax)
*christopher.baum@myfloridalegal.com*
*Counsel for Defendant/Appellant*

*Family Health Centers of Southwest Florida, Inc. v. Weida, No. 23-10992*

# <u>CERTIFICATE OF INTERESTED PERSONS AND<br>CORPORATE DISCLOSURE STATEMENT</u>

Counsel for the Secretary, Florida Agency for Health Care Administration, certifies that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3.:

1. Baum, Christopher J., *Counsel for Defendant/Appellant*

2. Becerra, Xavier, Secretary, U.S. Department of Health and Human Services, *Defendant/Appellee*

3. Bell, Daniel, *Counsel for Defendant/Appellant*

4. Bookman, Lloyd, *Counsel for Plaintiff/Appellee*

5. Bittman, Michael, *Counsel for Plaintiff/Appellee*

6. Bunton, Samuel, *Counsel for Defendant/Appellant*

7. Chappell, Hon. Sheri Polster, *United States District Judge*

8. Family Health Centers of Southwest Florida, Inc, *Plaintiff/Appellee*

9. Florida Attorney General's Office

10. Garcia, Paul, *Counsel for Plaintiff/Appellee*

11. Hooper Lundy & Bookman, PC, *Counsel for Plaintiff/Appellee*

12. Hoppmann, Karin, *Counsel for Defendant/Appellee*

13. Mizell, Hon. Nicholas P., *United States Magistrate Judge*

14. Moody, Ashley, *Attorney General of Florida*

15. Nelson Mullins Riley & Scarborough, LLP, *Counsel for Plaintiff/Appellee*

16.    Pohl, Beverly, *Counsel for Plaintiff/Appellee*

17.    Richmond, Stephen, *Counsel for Defendant/Appellee*

18.    Sclar, Erin, *Counsel for Plaintiff/Appellee*

19.    Senelick, Devin, *Counsel for Plaintiff/Appellee*

20.    Sheeran, Andrew, *Counsel for Defendant/Appellant*

21.    Smart, Adam, *Counsel for Defendant/Appellee*

22.    Torres, Christopher, *Counsel for Defendant/Appellant*

23.    Varnado, James, *Counsel for Defendant/Appellant*

24.    Weida, Jason, Secretary, Florida Agency for Health Care
       Administration, *Defendant/Appellant*

25.    Whitaker, Henry, *Counsel for Defendant/Appellant*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: July 24, 2023                    /s/ Christopher J. Baum
                                        Christopher J. Baum, B.C.S.

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant respectfully suggests that oral argument would aid the Court in deciding this case, which presents a novel issue of statutory interpretation. Resolving that issue correctly is of critical importance, as hundreds of millions of dollars in State expenditures turn on the Court's interpretation.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................ i

STATEMENT REGARDING ORAL ARGUMENT .............................................. ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF JURISDICTION ..................................................................1

STATEMENT OF THE ISSUE ........................................................................1

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE .........................................................................3

    I.    LEGAL BACKGROUND ..................................................................3

    II.    PROCEDURAL HISTORY ...............................................................6

    III.    STANDARD OF REVIEW ...............................................................9

SUMMARY OF THE ARGUMENT .................................................................10

ARGUMENT ...........................................................................................11

    I.    UNDER SECTION 1396A(BB)(3)(B), A CHANGE IN THE "SCOPE OF SUCH SERVICES" ENCOMPASSES ONLY THE ADDITION OF A NEW SERVICE OR THE ELIMINATION OF AN EXISTING SERVICE. ........................................11

CONCLUSION ........................................................................................23

CERTIFICATE OF COMPLIANCE .................................................................23

CERTIFICATE OF SERVICE........................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barton v. U.S. Att'y Gen.*,
  904 F.3d 1294 (11th Cir. 2018)..............................................................19

*Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp.
  N. Lines v. CSX Transp., Inc.*,
  522 F.3d 1190 (11th Cir. 2008)..............................................................13

*Carter v. City of Melbourne*,
  731 F.3d 1161 (11th Cir. 2013)..............................................................10

*CBS Inc. v. PrimeTime 24 Joint Venture*,
  245 F.3d 1217 (11th Cir. 2001)..............................................................20

*Comm'r v. Beck's Estate*,
  129 F.2d 243 (2d Cir. 1942)..................................................................21

*\*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991) ...........................................................................13

*Home Care Ass'n of Am. v. Weil*,
  799 F.3d 1084 (D.C. Cir. 2015) ............................................................17

*K.G. ex rel. Garrido v. Dudek*,
  839 F. Supp. 2d 1254 (S.D. Fla. 2011) ..................................................17

*Khoury v. Miami-Dade Cty. Sch. Bd.*,
  4 F.4th 1118 (11th Cir. 2021)...............................................................9

*Lamie v. United States Tr.*,
  540 U.S. 526 (2004) ...........................................................................19

*Martineau v. Ghezzi*,
  389 F. Supp. 187 (N.D.N.Y. 1974) ........................................................17

*Myers v. TooJay's Mgmt. Corp.*,
  640 F.3d 1278 (11th Cir. 2011)..............................................................16

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) .........................................................................20

*Shipley v. Helping Hands Therapy*,
  996 F.3d 1157 (11th Cir. 2021)..............................................................12

*Three Lower Ctys. Cmty. Health Servs., Inc. v. Maryland*,
  498 F.3d 294 (4th Cir. 2007) .................................................................4

*Va. Uranium, Inc. v. Warren*,
  --- U.S. ---, 139 S. Ct. 1894 (2019) ...................................................13

## Statutes

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

42 U.S.C. § 1396a ..........................................................................passim

42 U.S.C. § 1396d ..................................................................................3

42 U.S.C. § 1983 .................................................................................1, 7

42 U.S.C. § 254b ...............................................................................3, 4

## Other Authorities

A. Scalia & B. Garner,
  Reading Law: The Interpretation of Legal Texts (2012) ...............20, 21

American Heritage Dictionary (5th ed. 2012) ......................................17

Effect of the Medicare Economic Index (MEI) on the Physician Update, Ctrs. for
  Medicare & Medicaid Servs. (Aug. 8, 2006),
  https://www.cms.gov/newsroom/fact-sheets/effect-medicare-economic-index-
  mei-physician-update ...................................................................4, 15

Black's Law Dictionary (11th ed. 2019) .........................................17, 18

*Report to the HHS Secretary: Review of the Medicare Economic Index*,
  2012 Medicare Economic Index Technical Advisory Panel, (Aug. 27, 2012),
  https://www.cms.gov/regulations-and-guidance/guidance/faca/downloads/mei-
  review-report-to-hhs.pdf ..............................................................5, 15

Webster's Third New Int'l Dictionary Unabridged (1961) ....................17

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Appellee's 42 U.S.C. § 1983 claim under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment of March 1, 2023, granting Appellee's motion for summary judgment on all claims and denying Appellant's motion for summary judgment. DE 78; DE 79. Appellant's notice of appeal was timely filed on March 24, 2023. DE 81.

## STATEMENT OF THE ISSUE

Whether Florida's State Medicaid Plan's definition of a change in the "scope of such services" provided by a federally qualified health center is consistent with 42 U.S.C. § 1396a(bb)(3)(B).

## INTRODUCTION

More than twenty years ago, Congress changed the method for calculating Medicaid reimbursements for federally qualified health centers (FQHCs), which provide healthcare services to Medicaid patients, to move away from a calculation based on an FQHC's actual costs. Before 2001, each FQHC was reimbursed for 100% of its reasonable costs in providing services to Medicaid recipients. Now, payments to FQHCs are calculated based on the FQHC's per-visit payment amount from the previous year. That amount is then adjusted both for inflation and for any change in the "scope of such services" the FQHC provides compared to the previous

1

year. The inflation adjustment, in turn, is based on the Medicare Economic Index, a measure of inflation calculated by reference to a bundle of inputs reflecting providers' practice costs and wage levels. The formula thus accounts for an FQHC's yearly cost increases and for any year-to-year changes in what services an FQHC provides. In keeping with this statutory formula, Florida's Medicaid program adjusts FQHC payments based on the Medicare Economic Index and whenever an FQHC adds or removes a service. The Centers for Medicare & Medicaid Services has approved Florida's payment calculation method several times.

Family Health Centers of Southwest Florida, Inc. (FHC), an FQHC, has discovered that its costs have outstripped the rate of annual Medicare Economic Index adjustments. So it sued Florida, arguing that the statute unambiguously entitles it to reimbursement for additional cost increases on the theory that its increased costs should be accounted for as well in the "scope of such services" it is providing. The district court agreed. If the district court's judgment were upheld, Florida would be required to disburse an additional quarter of a billion dollars every year to FQHCs.

The statute does not require that result. It makes pellucid that changes to the "scope of such services" refer to changes in which services FHC provides, not changes in the costs of services, or to the "amount" or "duration" or "intensity" of services. The district court's contrary conclusion would effectively allow FHC a double adjustment for increased costs when it has not added any services. FHC's

payment is separately adjusted for cost increases through the Medicare Economic Index adjustment and accounts for increases in the frequency and amount of services provided by paying FHC for services on a per-visit basis. The district court's conclusion to the contrary is the opposite of the one Congress made in the statute, which was to stop reimbursing FQHCs based on their actual costs. This Court should reverse.

## STATEMENT OF THE CASE

### I. LEGAL BACKGROUND

Medicaid, which helps states provide medical care to certain low-income, elderly, and disabled people, is administered jointly by the federal government and the states. Each State submits a Medicaid State Plan to the Centers for Medicare and Medicaid Services (CMS) for approval; federal law contains a detailed set of requirements that state plans must meet. *See* 42 U.S.C. § 1396a. The federal government then matches a portion of a state's Medicaid expenditures made in accordance with a state plan that CMS approves.

Generally speaking, federally qualified health centers (FQHCs) are certain healthcare providers that receive grant funding under 42 U.S.C. § 254b and maintain an outpatient health program. *See* 42 U.S.C. § 1396d(*l*)(2)(A). Among other things, they are required to participate in the State's Medicaid Program and to provide

essential health care services to medically underserved populations regardless of a patient's ability to pay. *See id.* § 254b(k)(3).

The Medicaid Act requires that State Medicaid Plans pay FQHCs for their delivery of services to Medicaid recipients. 42 U.S.C. § 1396a(bb)(1). "From 1989 through 2000, the federal Medicaid program required States to reimburse FQHCs for '100 percent . . . of [each FQHC's] costs which are reasonable.'" *Three Lower Ctys. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 297 (4th Cir. 2007) (quoting 42 U.S.C. § 1396a(a)(13)(C) (repealed 2000)); *see also* Pub. L. No. 101–239, § 6404(a), (c), 103 Stat. 2106, 2264 (1989) (originally codified as 42 U.S.C. § 1396a(a)(13)(E)); Pub. L. No. 105–33, § 4712(a), 111 Stat. 251, 508 (1997) (originally codified as 42 U.S.C. § 1396a(a)(13)(C)).

"To relieve health centers from having to supply new cost data every year," however, "Congress amended the Medicaid Act in 2000 to implement a new *prospective* payment system based on average historical costs plus a cost-of-living factor." *Three Lower Ctys.*, 498 F.3d at 298. That cost-of-living factor is the Medicare Economic Index, which is "a measure of inflation faced by physicians with respect to their practice costs and general wage levels." Effect of the Medicare Economic Index (MEI) on the Physician Update, Ctrs. for Medicare & Medicaid

Servs. (Aug. 8, 2006).[1] It "includes a bundle of inputs used in furnishing physicians' services such as physician's own time, non-physician employees' compensation, rents, medical equipment, etc." *Id.* And it "measures year-to-year changes in prices for these various inputs based on appropriate price proxies." *Id.*

FQHCs are thus now reimbursed prospectively on a per-visit basis at a predetermined rate specific to each FQHC. 42 U.S.C. § 1396a(bb)(3). So in 2001, payments were calculated on a per-visit basis "equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services," adjusted to account for "any increase or decrease in the scope of such services." *Id.* § 1396a(bb)(2). For years after 2001, though, the payment does not depend on the FQHC's actual costs. Instead, it is calculated on a per-visit basis "equal to the amount calculated . . . for the preceding fiscal year," adjusted (1) for changes in physicians' expenses (as determined by the Medicare Economic Index) and (2) "to take into account any increase or decrease in the scope of such services furnished by the center or clinic during that fiscal year." *Id.* §§ 1396a(bb)(3)(A), (B).

---

[1]    https://www.cms.gov/newsroom/fact-sheets/effect-medicare-economic-index-mei-physician-update; *see also Report to the HHS Secretary: Review of the Medicare Economic Index*, 2012 Medicare Economic Index Technical Advisory Panel, at 13 (Aug. 27, 2012) (listing inputs to Medicare Economic Index), https://www.cms.gov/regulations-and-guidance/guidance/faca/downloads/mei-review-report-to-hhs.pdf.

Accordingly, Florida's Medicaid State Plan requires FQHCs' rates to be adjusted for any change in the scope of services they provide. "[A] change in scope of service is defined as: (a) the addition of a new service not previously provided by the FQHC; (b) the elimination of an existing service provided by the FQHC," while "[a] change in the cost of a service such as an addition or reduction of staff members to or from an existing service is not considered a change in scope of service." DE 65 at 5. CMS has approved Florida's Medicaid State Plan, containing this definition, several times. DE 65 at 5–6.

Meanwhile, CMS has issued general guidance in a letter to state health officials expressing a view on the meaning of "any increase or decrease in the scope of such services." That guidance, issued in 2001 and 2010, suggested that "[a] change in the 'scope of services' is defined as a change in the type, intensity, duration and/or amount of services. A change in the cost of a service is not considered in and of itself a change in the scope of services." DE 31 at 10, 11.

## II. PROCEDURAL HISTORY

Appellee Family Health Centers of Southwest Florida, Inc. (FHC) is an FQHC operating clinics and offices in Florida. In 2019, it requested an adjustment to its payment amount from the Appellant, Florida's Agency for Health Care Administration (the state agency responsible for administering Florida's Medicaid Program) (the "Agency"). DE 31 at 16. FHC sought an adjustment "to reflect the

6

fact it is providing an increased scope of services, including more types of services, a greater intensity of services, longer durations of services, and a greater amount of services." DE 31 at 16. In FHC's view, it should receive an adjustment for increases in its average cost per visit, based on changes to the length of physician encounters, the health of its patient population, and new equipment. DE 31 at 20–23. The Agency granted an adjustment based on FHC's addition of optometry services but, relying on the State Plan's definition of change in "scope of such services," denied any other adjustment. DE 63 at 8.

FHC then sued the Agency[2] under 42 U.S.C. § 1983, alleging that it violated 42 U.S.C. § 1396a(bb)(3)(B)'s requirement that FQHC rates be adjusted for "any increase or decrease in the scope of such services." DE 1. FHC sought an order requiring the Agency to submit a state plan amendment to CMS changing the definition of change in scope of services to include "a change in the type, intensity, duration and/or amount of services." DE 31 at 29. FHC argued that its "request for adjustment was based on the fact that . . . FHC has experienced substantial cost

---

[2] FHC also sued Secretary of the U.S. Department of Health and Human Services in his official capacity, alleging that he violated the Administrative Procedure Act by approving Florida's State Plan Amendment that included the definition of change in scope of services. DE 31 at 26. The HHS Secretary moved to dismiss FHC's complaint for, among other things, lack of standing. DE 39. Concluding that any injury suffered by FHC was not redressable through relief against the HHS Secretary, the district court granted the motion and dismissed the federal defendant. DE 48 at 17.

increases," DE 63 at 8; specifically, that it faced "increased costs per visit of providing services at a rate much greater than the annual [Medicare Economic Index] adjustments," DE 31 at 23.

After discovery, the parties filed cross-motions for summary judgment. FHC argued that Florida's definition of the change in scope of services is inconsistent with both the plain meaning of the statute and with CMS's guidance. Meanwhile, the Agency argued that Florida's definition is consistent with the statute's plain meaning and that CMS's guidance was not entitled to deference.

The district court granted summary judgment for FHC. It held that "Florida's definition of 'any increase or decrease in the scope of such services' is impermissibly narrow in violation of federal law." DE 78 at 7. In the district court's view, "[t]ext, context, and structure," as well as "policy considerations" underlying the statute, "all support" that "'any increase or decrease in the scope of such services' as used in 42 U.S.C. § 1396a(bb)(3) is more expansive than Florida's more limited definition." DE 78 at 10. Because the district court held that Section 1396a(bb)(3)(B)'s meaning was plain and unambiguous, it did not reach the issue of whether the CMS guidance was entitled to any deference. DE 78 at 11–12.

Finally, in granting FHC's motion, the court did not "define 'any increase or decrease in the scope of such services' or mandate the Secretary [to] define it in a specific way beyond that it must comport with federal law." DE 78 at 12. Nor did

the Court provide any timeline on which the Agency was required to submit a State Plan Amendment to CMS.

This appeal followed.

After the Agency appealed, FHC moved to enforce the judgment, and in response the Agency moved for a stay pending appeal, seeking to preserve the status quo. In so doing, the Agency presented evidence that if FHC prevails, the Agency will be required to pay an additional *$256 million dollars* per year because an amendment to the State Plan reflecting FHC's interpretation would apply to all FQHCs (as well as rural health clinics) in Florida. DE 89-1 at 3. By contrast, FHC would be entitled to a rate adjustment that would increase its revenue by approximately $23 million per year. *Id.* As of July 24, 2023, the district court had not ruled on either motion.

## III.  STANDARD OF REVIEW

The Court "review[s] de novo" the district court's order granting summary judgment for FHC, "applying the same legal standards applied by the district court in the first instance." *Khoury v. Miami-Dade Cty. Sch. Bd.*, 4 F.4th 1118, 1124 (11th Cir. 2021). "Summary judgment should be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). The Court also reviews de novo the district court's

denial of the Agency's motion for summary judgment. *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013).

## SUMMARY OF THE ARGUMENT

An FQHC's payment is adjusted yearly based on the Medicare Economic Index and on changes to the "scope" of services it provides. 42 U.S.C. § 1396a(bb)(3). The district court held that this language unambiguously requires Florida to adjust payments to FQHCs not only when they add a new service, but also when the costs of their existing services change because of increases in the "amount," "duration," or "intensity" of those services. The district court therefore ordered Florida's Medicaid program to change the longstanding formula it has used to calculate payments to FQHCs, changes that would cost the program about a quarter of a billion dollars each year.

The district court erred. The statutory context establishes that, on the contrary, "scope" does not incorporate the concepts of "amount," "duration," or "intensity," as Section 1396a consistently uses those terms together *except* in Section 1396a(bb). The meaning of the word "scope" supports as much. So does the very structure of the calculation method that Congress enacted: FQHCs are reimbursed on a per-visit basis, meaning that changes in the "amount" of services are already accounted for, while changes to the "duration" or "intensity" of services are simply changes to an FQHC's costs. And cost changes are separately accounted for with the Medicare

10

Economic Index adjustment. Put simply, FHC is not entitled to a double adjustment for its cost increases. Florida's definition of "scope of such services" is thus fully consistent with Section 1396a(bb), and this Court should reverse.

## ARGUMENT

FHC's arguments reveal that its fundamental disagreement is not with the Agency's definition of "scope of such services." At bottom, FHC disagrees with Congress's decision to stop reimbursing FQHCs based on their actual costs and instead reimburse them based on estimated costs reflecting changes to the Medicare Economic Index and the services that they provide. But FHC is not entitled to circumvent the statute's plain text and obtain additional reimbursements for cost increases for which it is already compensated through the Medicare Economic Index.

## I. UNDER SECTION 1396A(BB)(3)(B), A CHANGE IN THE "SCOPE OF SUCH SERVICES" ENCOMPASSES ONLY THE ADDITION OF A NEW SERVICE OR THE ELIMINATION OF AN EXISTING SERVICE.

To recap, FHC's per-visit payment amount is calculated by taking the previous fiscal year's amount, adjusting it based on the Medicare Economic Index, and adjusting it based on any changes to the "scope of such services" provided during the fiscal year. 42 § U.S.C. 1396a(bb)(3). The key issue here, regarding the "scope of such services" adjustment, is whether that adjustment should change only based on *which* services an FQHC provides or (as FHC contends) also based on whether the FQHC's costs have changed, captured by changes in the "duration,"

"amount," or "intensity" of services. The answer to that question depends on what it means for the "scope of such services" to change. For several reasons, the "scope of such services" changes only when an FQHC provides an additional service or stops providing an existing service.

**A.** Whether the Agency's definition is consistent with federal law is "a question of statutory interpretation," so the Court's "analysis starts with [the statute's] plain text." *Shipley v. Helping Hands Therapy*, 996 F.3d 1157, 1159 (11th Cir. 2021). FHC contends that "scope of such services" includes the concepts of "amount" or "duration" of such services, so that changes in the amount or duration of the services in question also change their "scope." But over and over again in not only the same Act but even in the same statutory section (Section 1396a), Congress used the phrase "amount, duration, or scope" or "amount, duration, and scope," while in Section 1396a(bb) it omitted the terms "amount" and "duration" when using "scope."[3] That omission was an intentional indication that changes in the "scope of

---

[3] *E.g.*, 42 U.S.C. § 1396a(a)(2) ("will not result in lowering the *amount, duration, scope*, or quality of care and services available under the plan" (emphasis added)); *id.* § 1396a(a)(10)(B) ("shall not be less in *amount, duration, or scope*" (emphasis added)); *id.* § 1396a(a)(10)(C) ("description of . . . the *amount, duration, and scope* of medical assistance" (emphasis added)); *id.* § 1396a(a)(10)(G) ("making available of such services of the same *amount, duration, and scope*" (emphasis added)); *id.* § 1396a(e)(16)(B)(i) ("all items and services covered under the State plan (or waiver) that are not less in *amount, duration, or scope*" (emphasis added)); *id.* § 1396a(f) ("similarly situated individuals are eligible to receive medical assistance equal in *amount, duration, and scope*" (emphasis added)).

such services" trigger adjustments to the payment amount, but changes in the "amount" or "duration" of those services do not. *Va. Uranium, Inc. v. Warren*, 587 U.S. ---, 139 S. Ct. 1894, 1900 (2019) (plurality) (explaining that "in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write").

If Congress had intended "scope" to encompass "amount" or "duration," it wouldn't have used those terms side-by-side with "scope" fifteen times in Section 1396a; those uses were not superfluous. *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) ("courts must reject statutory interpretations that would render portions of a statute surplusage"). FHC's position is contrary to the elementary principle of statutory interpretation that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (quotation omitted).[4] The text of the statute thus establishes that a change in the "scope of such services" means only a change to *which* services are provided.

---

[4] The district court did not address this argument at summary judgment, but in denying the Agency's motion to dismiss the court rejected it by saying that the Agency's "longwinded interpretations are dense and overcomplicat[e] the issue." DE 48 at 15.

More than just the plain text supports that a change in the "scope of such services" does not include a change in the "amount" of such services. An FQHC's payment is calculated on a per-visit basis. If an FQHC provides more of the same services to patients—imagine that instead of seeing 100 patients a year the doctor sees 1,000—the "amount" of services has increased. And make no mistake, this is what FHC means by changes in "amount." DE 31 at 22. (describing its "Change in Amount of Services" as an "increase in the number of distinct patients" and "increase in the total patient visits"). But Congress did not provide that the FQHC's payment amount would be adjusted based on that increase in amount; payments are, after all, calculated on a per-visit basis, so the FQHC just receives a payment accounting for *more visits*—900 more in this example. Changes to the "scope of such services" thus do not include changes to the "amount" of services provided. The district court's ruling to the contrary effectively holds that the statute requires Florida to double-count visit frequency in calculating FHC's Medicaid payments.

FHC is equally mistaken that changes in the "duration" or "intensity" of services reflect changes in their "scope." FHC's request for an adjustment for "duration" or "intensity" is just a different way of asking for an adjustment for its changes in the actual cost of the services provided. For example, the longer a service is provided, or the more intense its provision, the more it likely costs. *See* DE 31 at 20, 22 (defining FHC's "Change in Duration of Services" as including "longer

14

clinician encounters" and "Change in Intensity of Services" as including "more intensive care").[5] Yet Congress *replaced* a cost-based calculation method with Section 1396a(bb), which sets a baseline for a provider's costs and accounts for changes to physicians' expenses through adjustments based on the Medicare Economic Index.

Each year, the payment amount is "increased by the percentage increase in the MEI," the Medicare Economic Index. 42 U.S.C. § 1396a(bb)(3)(A). The Medicare Economic Index reflects physicians' "practice costs and general wage levels" by measuring "year-to-year changes in prices for" a "bundle of inputs" such as "a physician's own time, non-physician employees' compensation, rents, medical equipment, etc." Effect of the Medicare Economic Index (MEI) on the Physician Update, Ctrs. for Medicare & Medicaid Servs. (Aug. 8, 2006).[6] In other words, Section 1396a(bb)(3) *already accounts for changes in services' cost.*

---

[5] FHC also uses the terms "duration" and "intensity" of services to capture changes in the "amount" of services, which as explained are plainly excluded from the definition. FHC defines "Change in Duration of Services" as "including more clinician encounters"—which is just an increase in the "amount" of services. DE 31 at 22. So too with FHC's definition of "Change in Intensity of Services." DE 31 at 20 (defining it to include "more clinician encounters, longer clinician encounters [i.e., 'duration'], and more medications and procedures").

[6] https://www.cms.gov/newsroom/fact-sheets/effect-medicare-economic-index-mei-physician-update; *see also Report to the HHS Secretary: Review of the Medicare Economic Index*, 2012 Medicare Economic Index Technical Advisory Panel, at 13 (Aug. 27, 2012) (listing inputs to Medicare Economic Index),

If the statute captured changes in the cost of a particular service other than by using the Medicare Economic Index, it would say so. Instead, Congress omitted the terms "duration" and "intensity" from the calculation method. *See Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011) (when "Congress knows how to say something but chooses not to, its silence is controlling"). Moreover, if FHC were right about what "scope of such services" means, it would be entitled to overlapping payment increases for changes to the cost of services based on amount, duration, or intensity. Indeed, FHC spends pages in its complaint arguing that it should be entitled to a payment adjustment for changes to those very same inputs. DE 31 at 20–23. Nothing indicates Congress intended to allow FQHCs to receive two payment adjustments for the same thing.

**B.** In rejecting the Agency's common-sense interpretation, the district court advanced several arguments. None has merit.

To start, the district court purported to rely on dictionary definitions of "scope." According to the district court, certain such definitions "sugges[t] room for FQHCs to receive adjustments for a wide range of reasons." DE 78 at 8. In particular, the district court asserted, "[a] change in the extent of services covers more than just an addition or elimination of a service." DE 78 at 8.

---

https://www.cms.gov/regulations-and-guidance/guidance/faca/downloads/mei-review-report-to-hhs.pdf.

But the dictionaries are perfectly consistent with what the statutory context makes clear—that "scope" here refers to particular kinds of services, not their amount, duration, or intensity. "Scope," as used in this context, generally means the "range" or "extent" of something. *See* SCOPE, American Heritage Dictionary (5th ed. 2012) ("The extent of a given activity or subject that is involved, treated, or relevant.").[7] And here, the "range" or "extent" of such services could just as well refer to when an FQHC broadens or narrows the range of services it provides by adding or removing a service.[8] Courts have used the term "scope" when discussing services in the same way.[9]

---

[7] *See also* SCOPE, Webster's Third New Int'l Dictionary Unabridged (1961) ("the general range or extent of cognizance, consideration, activity, or influence," or "the limited field or subject under consideration, the range of the matter being treated, the marked off area of relevancy")

[8] *See* SCOPE OF BUSINESS, Black's Law Dictionary (11th ed. 2019) (describing "[t]he *range* of activities that are reasonably necessary to operate a commercial venture successfully" (emphasis added)); *see also* SCOPE OF EMPLOYMENT, Black's Law Dictionary (11th ed. 2019) (describing "[t]he *range* of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business" (emphasis added)).

[9] *E.g.*, *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1260, 1261–62 (S.D. Fla. 2011) (explaining that a state "is entitled to define the scope of services covered by the Medicaid Act," and when it determines that a particular service "is not within that scope," it can decline to cover that service); *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C. Cir. 2015) (describing new rule limiting definition of "companionship services" to certain services, which had the "effect of limiting the scope of [the statute's] companionship-services exemption"); *Martineau v. Ghezzi*, 389 F. Supp. 187, 189–90 (N.D.N.Y. 1974) (analyzing statute that "defines the scope of services which a barber may render," and listing services).

17

Indeed, the term "scope" is often used in that way. The "scope" of services provided can be as broad as possible. REPRESENTATION, Black's Law Dictionary (11th ed. 2019) (defining "full-scope representation" as when lawyer provides "legal services from beginning to end on all aspects of a matter"). Or the "scope" can be limited to only *some* services. *Id.* (defining "limited-scope representation" as involving "provision of discrete, selected services"). That is why a "scope-of-work clause" sets forth "what work is to be performed under the contract"—i.e., it *lists the services* that the contractor will provide. SCOPE-OF-WORK CLAUSE, Black's Law Dictionary (11th ed. 2019). In each instance, the word "scope" is used as a synonym for "range of services" or as a way to say "the list of services or actions" contemplated by the parties. The district court was thus wrong that the dictionaries make it "unambiguously clear" that "scope" inevitably possesses a broader meaning. DE 78 at 9–10.

Next, the district court concluded that how Section 1396a "uses 'scope' throughout implies there can be a change in the scope of a single service." DE 78 at 10. But Section 1396a consistently uses the term "scope" in conjunction with the word "services," plural, and nowhere applies the term to a single service. The lone contrary instance provided by the district court in support of its assertion that Section 1396a uses the term "throughout" in some other fashion is no counterexample at

18

all.[10] Likewise, in Section 1396a(bb), the word "scope" does not modify the term "service"; it modifies the words "such services," plural. It thus does not suggest that any particular service has a scope that could change in a way that would trigger an adjustment.

In the district court's view, the Agency's interpretation would also render some words in the statute superfluous by making the statute effectively read "any increase or decrease in services" rather than "any increase or decrease *in the scope of* such services." DE 78 at 9. Not so. Using the word "scope" makes clear that only changes to the list of services that an FQHC provides require an adjustment. By contrast, if the statute read "any increase or decrease in services," changes to any particular service provided could arguably be included, injecting uncertainty into the statute. And "'applying the rule against surplusage is, absent other indications, inappropriate' when it would make an otherwise unambiguous statute ambiguous." *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1301 (11th Cir. 2018) (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 536 (2004)). Requiring an increase or decrease in "scope" thus more precisely captures the intended meaning. *See id*. By contrast, the

---

[10] The district court's example does not describe the "scope" of a single service; it states that the making available of certain services to specified Medicaid recipients does not require providers to make those same "services," plural, "of the same amount, duration, and scope" available to other individuals. 42 U.S.C. § 1396a(a)(10)(G); *see* DE 78 at 10.

district court's preferred meaning allows FHC to be reimbursed based on its actual costs in contravention of the statutory design.

The district court also asserted that Congress's use of the word "any" in the phrase "any increase or decrease in the scope of such services" meant that "the kind of increases warranting 'scope' rate adjustments" was intended "to be broad and encompass many circumstances." DE 78 at 8. Yet the word "any" in this context modifies "increase or decrease," not "scope"—so it means only that "all" increases or decreases in scope, not merely "some" increases or some decreases in scope, require an adjustment. DE 78 at 8 (quoting *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001)); *see Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[w]ords are to be given the meaning that proper grammar and usage would assign them" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012))).

**C.** Finally, the district court relied on the "policy considerations" purportedly "underlying the statute." DE 78 at 10. In the court's view, those policies included "ensur[ing that] FQHCs caring for Medicaid eligible patients are appropriately reimbursed for the services they provide," meaning that the statute "must be interpreted to ensure that adjustments allow FQHCs to maintain reasonable rates." DE 78 at 10–11. And in the district court's view, "[i]t makes no sense to endorse an

interpretation . . . that drops a FQHC's rate far below their reasonable cost of providing services." DE 78 at 11.

In so reasoning, the district court substituted its policy judgment for Congress's. Congress's policy in the statute was to reject reasonable-cost reimbursement, which was the policy before the statute was amended in 2000. *See* 42 U.S.C. § 1396a(a)(13)(C) (repealed 2000). If Congress wanted States to account for an FQHC's costs through something other than the Medicare Economic Index, it would have said so rather than jettisoning an explicitly cost-based method. *See* A. Scalia & B. Garner, *supra* at 182 ("The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident." (quoting *Comm'r v. Beck's Estate*, 129 F.2d 243, 245 (2d Cir. 1942))). The district court's conclusion that its interpretation better reflected Congress's intended policy merely reflects the court's mistaken view that Congress intended to retain—rather than abandon—cost-based reimbursement specific to each FQHC when it enacted Section 1396a(bb).

In sum, the Court should hold that Florida's State Medicaid Plan is fully consistent with Section 1396a(bb).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and render judgment for the Agency.

Respectfully submitted.

ASHLEY MOODY
Attorney General

*/s/ Christopher J. Baum*
HENRY C. WHITAKER
*Solicitor General*
DANIEL W. BELL
*Chief Deputy Solicitor General*
CHRISTOPHER J. BAUM, B.C.S.
*Senior Deputy Solicitor General*

Office of the Attorney General
1 SE 3rd Ave Suite 900
Miami, FL 33131
(978) 460-1314
(850) 410-2672 (fax)
*christopher.baum@myfloridalegal.com*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,203 words.

2.      This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Christopher J. Baum*
Christopher J. Baum, B.C.S.

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the foregoing Brief with the Clerk of Court by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christopher J. Baum*
Christopher J. Baum, B.C.S.